**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Michael Bradley, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 25-cv-13586 |
| v. | ) | |
| | ) | |
| Buyers Edge Platform, LLC | ) | JURY TRIAL DEMANDED |
| and John Davie, individually, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff, Michael Bradley, through his counsel, the Garfinkel Group, LLC complains against Buyers Edge Platform, LLC and John Davie, individually, for violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, the Illinois Securities Law, 815 ILCS 15/1 *et seq.*, breach of fiduciary duty under Illinois common law, and fraudulent inducement under Illinois common law, and in support thereof states:

## INTRODUCTION

This is a civil action seeking relief for securities fraud by Defendants for defrauding Plaintiff, Michael Bradley, a former executive at Produce Alliance, LLC, a wholly owned subsidiary of Defendant Buyers Edge Platform, LLC ("BEP"). Defendant John Davie is part of a tightly controlled cabal of insiders, who prioritized their own financial gain over their legal and fiduciary obligations. Defendants transformed promises of equity participation into a sophisticated bait-and-switch scheme designed to extract maximum value for themselves at Bradley's and other employees' expense. Each new capital raise boosted the company's valuation and exponentially increased the value of their equity. Defendants lured Bradley with the offer of securities in BEP, while making material

misrepresentations and failing to provide any disclosures. However, in violation of federal and state securities law, Defendants concealed traps behind these promises, including hidden valuation hurdles, undisclosed tax liabilities, discretionary redemption provisions, and governance structures – all engineered to ensure that Defendants, not Mr. Bradley, reaped the rewards.

When the company secured a $425 million investment from outside investors, Defendants seized their opportunity to enrich themselves by eliminating Mr. Bradley and revoking his stake. With cold calculation, Defendants fabricated "cause" for his termination. Defendants' conduct amounted to more than broken promises, it was a coordinated conspiracy to defraud Bradley, deprive him of his vested equity, and enrich themselves through self-dealing and corporate malfeasance.

## PARTIES

1.      Plaintiff, Michael Bradley ("Plaintiff" or "Bradley"), is the former President of Produce Alliance, LLC.

2.      Bradley is a citizen of Minnesota.

3.      Defendant, Buyers Edge Platform, LLC ("BEP"), is a Delaware Limited Liability Company with its principal place of business in Waltham, Massachusetts.

4.      BEP is a nationwide procurement and technology company that consolidates purchasing power across the foodservice industry to negotiate vendor contracts, manage supply chains, and deliver pricing advantages to its affiliates and partners.

5.      At all relevant times herein, BEP transacted business in the State of Illinois.

6.      Defendant, John Davie ("Davie") is the Chief Executive Officer, and majority owner of BEP.

7.      By virtue of his majority ownership, John Davie controls the Board of Managers of BEP.

## JURISDICTION & VENUE

2

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

9.      Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the acts or omissions giving rise to the claims occurred in this District.

## STATEMENT OF FACTS

### Bregal Sagemount's Investment in BEP and BEP's Acquisition of a Minority interest in PA

10.  Plaintiff was hired on or about May 6, 2019, as PA's Chief Operating Officer, by then PA CEO, and majority equity owner, George Melshanker ("Melshanker").

11.      Plaintiff was employed by PA, from 2019 until his termination in December of 2023.

12.      During his employment with PA, Plaintiff worked in both Minnesota and Illinois.

13.      In approximately June 2019, Bregal Sagemount, a private equity firm, invested $30,000,000 in BEP.

14.  Subsequently, in approximately February 2020, BEP acquired a minority equity interest in PA.

15.      BEP acquired the minority interest from Melshanker and various other equity owners of PA.

16.      In conjunction with the acquisition of the minority interest in PA, Melshanker informed Davie that he was attempting to procure some form of equity in BEP on behalf of Plaintiff.

17.      In early 2020, Davie, BEP's CFO, John Rogers ("Rogers") and BEP's Board of Managers (the "Board") structured and approved an Equity Appreciation Rights Plan (the "Plan").

### THE JANUARY 2021 WEBINAR AND DAVIE'S "SALES PITCH"

22.      On January 20, 2021, Plaintiff received an email from BEP inviting him to attend a webinar scheduled for January 21, 2021.

23.     The invitation described the webinar as introducing a benefit available to "a select group of high-performing, tenured employees."

24.     On January 21, 2021, Davie conducted the webinar via Zoom.

25.     The webinar was attended by over 100 BEP and PA employees, including Plaintiff.

26.     To induce Plaintiff's participation in the Plan, Davie made several materially false and misleading statements and/or omissions.

27.     Davie began his sales pitch by stating that one of the ways that high-tech high-growth companies such as Uber, Google, and Facebook became so valuable was by taking in outside investments and that he [Davie] and his family wanted to retain control of BEP while bringing in these outside investments.

28.     Davie stated that he and his family owned over 80% of BEP.

29.     Next, Davie informed the participants that they would be receiving equity in BEP that was intended to motivate the participants to "stay with us."

30.     Davie further stated that they would be getting something that was the same thing as stock in BEP.

31.     Davie informed the participants that "if you're on this call, you are in the program."

32.     Davie further stated that employees are generally motivated by salary and that this was a way of motivating the participants to help grow BEP and that "as the company grows, the value of your ownership in this company is going to grow with it."

33.     Davie further stated that there was "no doubt that this would become a meaningful part of their compensation."

34.     Davie further stated that the value of their equity interests "were worth a lot" and would be worth a whole lot more and that "you don't ever have to pay for them."

4

35.     Reflecting his intent to keep the Plan's terms confidential and to prevent scrutiny from outside advisors or regulators, he told participants "don't go talking about this outside this group."

36.     Davie further stated, "[w]hatever they ultimately cash in at above this price is going to be capital gains tax, the best tax treatment you can get, 20%."

37.     Davie also informed the participants that on January 20, 2021, BEP had received an equity investment from the University of California, University of Notre Dame, and the Indiana Public Pension Fund (the "Institutional Investors"), that now valued their participation at $754 per interest, implying that the equity being offered carried the same value as that of institutional investment.

38.     However, Davie knew that these interests were to have no immediate value unless multiple conditions were met.

39.     As a result of the statements above, Plaintiff was induced to participate in the Plan and accept the First Tranche of CIU (defined below) through the provision of valuable consideration to PA, one of BEP's investments, in the form of his time, effort, continued employment, and refraining from seeking alternative compensation or employment opportunities.

## THE FIRST TRANCHE OF SECURITIES ARE TRANSFERRED TO PLAINTIFF

40.     On or about April 7, 2021, Plaintiff received an email through the Carta securities management platform requesting that he confirm his acceptance of a profits interest designated as CIU-189, which purported to grant Plaintiff 400 Company Incentive Units ("CIUs").

41.     The email contained a button to click and accept CIU-189.

42.     Plaintiff accessed this email and clicked "Accept," via a laptop computer on his web browser.

43.     At the time Plaintiff clicked "Accept," he had not been provided with any information, disclosures, documents, or had been afforded the opportunity to ask questions about the Plan's terms.

5

44. Immediately after clicking "Accept," Plaintiff observed that Certificate CIU-189 appeared on-screen, and his Carta dashboard reflected an orange status icon stating: "Received by Michael Bradley – pending."

45. By clicking "Accept" Plaintiff believed that he acknowledged receipt of the CIU certificate.

46. In doing so, Plaintiff was not and could not have been aware of any undisclosed contractual terms, nor could he have accepted such terms.

47. Notwithstanding that the events described above occurred on or about April 7, 2021, CIU-189 certificate was backdated with a stated grant date of March 1, 2020 (the "First Tranche").

48. Plaintiff then exited his web browser and took no further action.

49. In or around April 2021, Plaintiff learned that without any additional input or action by him, the Carta dashboard changed from "Received – pending" to "Accepted," and the icon changed from orange to green.

50. Following this change, a dropdown section became visible beneath Certificate CIU-189, which was not previously displayed at the time Plaintiff clicked "Accept."

51. The newly visible dropdown contained a declaration falsely attributed to Plaintiff, purporting to acknowledge receipt of CIU-189 and consent to the exclusive use of electronic certificates in lieu of paper or prior certificates.

52. The dropdown also included a series of factual representations that Plaintiff had never made, including that the:

(i) the Company has given it, at a reasonable time prior to the Grant Date, an opportunity to ask questions and receive answers regarding the terms and conditions of the Plan (including the BEP LLC Agreement, the Company LLC Agreement and this Agreement); (ii) the Company has given Member, at a reasonable time prior to the date hereof, an opportunity to obtain any additional information that the Company possesses or can acquire without unreasonable effort or expense deemed necessary by Member to verify the accuracy of the information provided, and Member received all such additional information requested; and (iii) Member has not relied on any of the Company or any of its "affiliates" (as defined in

6

Regulation D of the Securities Act of 1933), officers, employees or representatives in connection with Member's investigation of the accuracy of the information provided or Member's investment decision. The Member acknowledges that no person has been authorized to give any information or to make any representations concerning the Restricted Units, written or oral, that does not conform to the information included in the Plan, the BEP LLC Agreement, the Company LLC Agreement or this Agreement and if given or made, such other information or representation should not be relied upon as having been authorized by any of the Company or any of its respective affiliates, officers, employees or representatives.

53.     On the date ownership of the First Tranche transferred, 128 of Plaintiff's CIUs were vested and 362 were unvested.

54.     The balance of the First Tranche vested at a rate of 8 CIU per month.

### THE UNDISCLOSED PLAN TERMS

53.     Unbeknownst to Plaintiff, the Plan contained material information that expressly contradicted the statements made by Davie on the webinar or other material information omitted on the webinar.

54.     These material misstatements and/or omissions resulted in depriving Plaintiff of the ability to make a fully informed decision about accepting the CIUs, the opportunity to seek independent advice before accepting them, and resulted in significant damages to Plaintiff.

55.     Davie and BEP failed to disclose that the Plan provided certain employees and service providers, not with equity or stock in BEP, as had been represented on the webinar, but with *contractual rights* in the form of CIUs that mirrored certain restricted LLC interests of BEP ("Restricted Units").

56.     Davie and BEP failed to disclose that the Plan was governed by two primary documents: the Equity Appreciation Plan and individual Award Agreements ("Award Agreements") for each participant.

57.     Contrary to Davie's statements regarding Plaintiff receiving equity in BEP, the Plan expressly disclaimed any obligation to treat CIU holders as actual equity owners and required that participants rely solely on the discretion of BEP, for any payout or interpretation of value.

58. Davie and BEP failed to disclose that the Plan could be amended or terminated unilaterally.

59. The structure and administration of the Plan thus created an illusion of equity participation while denying participants any real ownership or enforceable interest in the business they were ostensibly incentivized to grow.

60. Davie and BEP never gave Plaintiff a full explanation of how the CIUs were structured, how their value was derived, or how they related to the restricted equity issued to others within BEP's capital structure.

61. Davie and BEP materially misstated that Plaintiff would receive a genuine stake, when he had no equity, no enforceable rights, and no path to accountability.

62. Davie and BEP failed to disclose the following material terms, that:

    a. the Plan would be administered by a committee appointed by the Board of Managers (the "Board"), or the Board itself if no committee is appointed, with broad discretion to grant awards, determine vesting schedules, interpret the Plan, and adjust awards;

    b. CIUs could vest based on time or performance conditions, as determined by the committee and that the committee could waive or accelerate vesting at its discretion;

    c. each CIU would be assigned a Pre-Issuance Company Value by the committee, which would serve as a threshold that must be exceeded before participants could share in the appreciation of the company's value (the "Hurdle Rate");

    d. the Fair Market Value of CIUs, including for repurchase purposes, would be determined by the Board in good faith;

    e. unvested CIUs would automatically forfeit upon any termination of service without consideration;

f. vested CIUs could be redeemed by BEP at no value if the participant was terminated for cause, as determined by the Board in its sole discretion;

g. vested CIUs could be redeemed at Fair Market Value if the participant was terminated without cause;

h. participants holding CIUs or Restricted Units would have no voting rights in the Company;

i. participants could only receive distributions in accordance with the LLC Agreement, subject to the Pre-Issuance Company Value;

j. participants would be required to agree to be bound by the Company LLC Agreement and sign a joinder agreement;

k. any disputes regarding interpretation of the Plan or any Award Agreement would be resolved by the Committee, whose decisions would be final and binding.

l. the Committee could amend or terminate the Plan at any time, with limited exceptions requiring participant consent, and that amendments to the LLC Agreement could affect Award Agreements;

m. the Committee could adjust awards in the event of mergers, recapitalizations, or other changes in capital structure to prevent dilution or improper enrichment.

63. In addition, the Plan incorporated, by reference, the LLC Agreement, including its transfer restrictions, call rights, rights of first refusal, and drag-along rights, and that in the event of any conflict, the LLC Agreement would govern.

64. At no point prior to the webinar or before being transferred the First Tranche, did BEP or Davie provide any disclosures that would have allowed Plaintiff to make an informed decision regarding the Plan and the CIUs, including but not limited to the valuation hurdles, vesting schedules,

9

forfeiture provisions, discretionary Board control over valuation and redemption, potential tax liabilities under IRC § 61(a) and FICA, or the conditions necessary for the CIUs to gain value.

### DAVIE'S STATEMENTS ON THE WEBINAR WERE MADE WITH SCIENTER

65.     Each of Davie's statements, described in paragraphs 27-37 above was materially false, misleading or omitted material facts and were made with scienter.

66.     Davie and BEP knew that the CIUs would not accrue any value unless BEP's preferred equity holders (including Bregal Sagemount) first received a full return of the pre-issuance company valuation hurdle, as Davie was personally involved in negotiating that valuation hurdle with Bregal Sagemount.

67.     Davie and BEP knew that Plaintiff's ability to realize value from the CIUs was entirely dependent on the discretionary managerial decisions of BEP's Board and executives, including Davie himself. Specifically, Davie retained exclusive control over liquidity events, valuation, and redemption, and thus knew that the CIUs were unlikely to accrue value without a major liquidity event and the Board of Managers had full discretion to even determine whether a liquidity event had occurred and what the fair market value of the CIUs were.

68.     Regarding the statements that "as the company grows, the value of your ownership in this company is going to grow with it," and that there was "no doubt that this would become a meaningful part of their compensation," that "this is a way to reward you for the sacrifice of last year," Davie knew that the CIUs were subject to vesting, cancellation for cause, and board discretion to determine value, because Davie was directly involved in creating and approving the Plan and its terms.

69.     Regarding the statement "whatever [the CIUs] ultimately cash in at above this price is going to be capital gains tax, the best tax treatment you can get, 20%", Davie knew that absent a valid IRC §83(b) election, ordinary income tax under IRC §61(a) and FICA taxes under IRC §§3101(a), 3101(b)(1), and 3101(b)(2) would apply at the time of vesting, rather than the favorable capital gains

tax treatment he promised, because he was directly involved in structuring the Plan with BEP's CFO and outside advisors. Furthermore, Davie deliberately omitted this information to make the CIUs appear more attractive to investors than they were.

70.     Regarding the statement "you don't ever have to pay for [the CIUs]," Davie knew that regardless of whether a IRC §83(b) election was made, the acquisition of the CIUs would result in a substantial income tax liability to the Plan participants due to the fact that they were not being transferred at a $0 fair market value, but after the investment by the Institutional Investors, that valued the CIU at $754 per unit, as he stated on the webinar. Davie's omission of this key fact shows his intent to mislead participants about the true financial consequences of accepting the CIUs.

71.     Further evidencing scienter, Davie instructed participants not to "discuss the Plan outside the group," thereby preventing them from obtaining independent advice about the Plan's terms and tax consequences and concealing the Plan's restrictive provisions and potential tax liabilities.

72.     Davie's role as CEO and majority owner, his personal involvement in structuring and approving the Plan, and his direct knowledge of the terms concealed all demonstrate that the statements and omissions on the webinar were intentional and/or made with reckless disregard for their truth.

### PLAINTIFF'S RELIANCE ON DEFENDANTS' STATEMENTS

73.     Plaintiff reasonably and justifiably relied on Davie's statements made during the January 21, 2021 webinar in deciding to accept the CIUs and continue his employment.

74.     Plaintiff's reliance was reasonable and foreseeable given Davie's role as CEO and majority owner of BEP, his exclusive control over the Plan's administration and terms, and the lack of any other disclosures or Plan documents provided to Plaintiff.

75.     At the time, Plaintiff had no reason to doubt Davie's representations, given Davie's position as CEO, and majority owner of BEP, and his authority to communicate the Plan's terms.

76. Without disclosure of the significant hurdles, discretionary conditions, tax consequences, and other risks discussed herein, Plaintiff relied on Davie's statements.

77. Had Plaintiff known the true terms of the CIUs, he would not have accepted the CIUs as compensation, would have sought additional cash compensation, or would have considered alternative employment opportunities.

78. Based on Davie and BEP's material omissions, and materially misleading statements, Plaintiff failed to make a §83(b) for the First Tranche for the 2021 tax year.

79. In addition, BEP was required to issue an IRS Schedule K-1 to Plaintiff for 2021 to report his allocable income from any vested CIUs.

80. Rather than reporting ordinary income on the 128 vested units at their minimum fair market value of $754 per unit (based on the valuation following the January 20, 2021, Institutional Investors' equity investment), BEP reported $0 income to Plaintiff on his 2021 Schedule K-1.

81. As a direct and proximate result of his reliance on Davie's false and misleading statements, Plaintiff:

    a. accepted the CIUs rather than negotiating for an alternative arrangement;

    b. remained employed and forewent other employment and compensation opportunities;

    c. incurred significant unexpected tax liabilities on vested CIUs at ordinary income rates, rather than the promised capital gains rates;

    d. ultimately was stripped of his vested and unvested CIUs without compensation when Defendants terminated him under pretextual circumstances;

    e. lost the anticipated benefits of the CIUs, including any potential share in the proceeds of a liquidity event; and

    f. suffered substantial economic harm, including but not limited to, the loss of expected compensation, additional tax liabilities, and lost career opportunities.

### BEP'S ACQUISITION OF PA AND CONTINUED PROMISES

82.     In June 2021, BEP acquired the remaining equity in PA.

83.     The balance of this equity was acquired from Melshanker, and certain of his family members.

84.     After the June 2021 acquisition of the majority interest in BEP, Davie exercised authority over compensation decisions at BEP, and PA, including payment of employee bonuses, awards of equity compensation, and other incentive rewards.

85.     After June 2021, Plaintiff continued his service at BEP's subsidiary, PA, for the benefit of BEP.

86.     In February 2022, then President of PA, and Plaintiff's supervisor, Melissa Melshanker ("Melissa"), sent Plaintiff an email confirming his 2022 compensation.

87.     The email included a reference to the 400 CIUs granted to Plaintiff and that transferred in 2021.

        a.   Plaintiff accepted the terms of the compensation agreement and continued providing valuable services to PA.

88.     Shortly thereafter, Liesenfelt, head of BEP's Fresh Concepts division, assumed the role of Plaintiff's supervisor.

89.     Melissa remained with the company until 2023.

### 2023 FRAUDULENT EQUITY PROMISES
### CONTINUED AND NEW MATERIAL MISTATEMENTS/OMISSIONS

90.     In or around June of 2023, Plaintiff was offered the role of President of PA.

91.     Between July and August of 2023, Plaintiff and Liesenfelt engaged in conversation regarding compensation for the new role.

92.     On August 24, 2023, Plaintiff met in Florida with Davie, Liesenfelt, and BEP's president, Tina Davie ("Tina").

93. The purpose of the meeting was for the parties to reach an agreement on Plaintiff's compensation for 2023.

94. During the negotiations, Davie, Liesenfelt, and Tina, informed Plaintiff that BEP again materially misstated that the CIUs were a material component of Plaintiff's compensation, and that he was going to be transferred an additional 400 CIU (the "Second Tranche").

95. Davie further stated that the value of the First Tranche to Plaintiff had grown to over $1,200,000, and that the First Tranche and the Second Tranche would continue to grow as the company grew and attracted new investors.

96. Davie and Liesenfelt further misstated that the Second Tranche being awarded was worth over $500,000.

97. The representations in Paragraphs 95-97 above, are the same material misrepresentations, and/or omissions that Davie had made on the webinar in January of 2021.

98. Furthermore, Davie and Tina repeatedly referred to "new third-party investments that were being negotiated" and knowingly misstated that this would "materially increase the value of his first and second tranche of CIUs."

99. Next, Davie knowingly misrepresented and promised Plaintiff that he could liquidate up to 50% of his vested CIUs after the next investment and that he should notify Rogers of what percentage of his CIUs Plaintiff wanted to liquidate.

100. Plaintiff emailed Rogers, as Davie directed, and Plaintiff requested to liquidate 50% of the First Tranche.

101. Rogers approved the sale of 50% of Plaintiff's CIUs.

102. Davie knowingly misrepresented that BEP was limiting the amount that could be liquidated to ensure that Plaintiff, and other employees continued their employment.

103.     In reliance on the representations made in this meeting and in the webinar of January 2021, Plaintiff agreed to continue his employment, provide valuable services and forgo other lucrative opportunities and agreed to a compensation arrangement that included the Second Tranche of 400 CIUs.

a.     Plaintiff was sent the same or similar email from CARTA on September 7, 2024.

104.     This time he accepted the Second Tranche via the CARTA app on his phone.

## DEFENDANTS' STATEMENTS IN THE AUGUST 2023 MEETING WERE MADE WITH SCIENTER

105.     As to the Second Tranche, Davie's statements in paragraphs 95-97 were materially false and/or misleading and were made with scienter as alleged in paragraphs 65-72 above.

106.     As to Plaintiff's ability to liquidate his CIUs, Davie knew these statements to be false and/or misleading.

107.     As to the value of the First and Second Tranche of the CIUs, Davie knew these statements to be false and/or misleading.

108.     As a result of the statements above, Plaintiff was induced to participate in the Plan and accept the Second Tranche of CIUs.

109.     Plaintiff did so by providing valuable consideration in the form of his time, effort, continued employment, and refraining from seeking alternative compensation or employment opportunities.

120.     Davie's role as CEO and majority owner, his personal involvement in structuring and approving the Plan, and his direct knowledge of the terms concealed all, in addition to the reasons discussed above demonstrate that the statements and omissions made in the August 24, 2023, meeting were intentional and/or made with reckless disregard for their truth.

## PLAINTIFF'S RELIANCE ON DEFENDANTS' STATEMENTS

121.   Plaintiff reasonably and justifiably relied on Davie's statements made during the January 21, 2021 webinar in deciding to accept the Second Tranche of CIUs and continue his employment.

122.   Plaintiff's reliance was reasonable and foreseeable given Davie's role as CEO and majority owner of BEP, his exclusive control over the Plan's administration and terms, and the lack of any other disclosures or Plan documents provided to Plaintiff.

123.   At the time, Plaintiff had no reason to doubt Davie's representations, given Davie's position as CEO and majority owner of BEP and his authority to communicate the Plan's terms.

124.   Without disclosure of the significant hurdles, discretionary conditions, and other risks discussed herein, Plaintiff relied on Davie's statements.

125.   Had Plaintiff known the true terms of the CIUs, he would not have accepted the CIUs as compensation, would have sought additional cash compensation, or would have considered alternative employment opportunities.

126.   As a direct and proximate result of his reliance on Davie's false and misleading statements or omissions relating to the Second Tranche, Plaintiff:

   a.   accepted the CIUs rather than negotiating for an alternative arrangement;

   b.   remained employed and forewent other employment and compensation opportunities;

   c.   was ultimately stripped of his vested and unvested CIUs without compensation when Defendants terminated him under pretextual circumstances;

   d.   lost the anticipated benefits of the CIUs, including any potential share in the proceeds of a liquidity event; and

   e.   suffered substantial economic harm, including but not limited to the loss of expected compensation, and lost career opportunities.

127. On or around September 26, 2023, Plaintiff received a compensation agreement from Brenda Andrade ("Andrade"), in BEP Human Resources, that was backdated to August 1, 2023.

128. The letter did not reflect the terms reached by the parties on August 23, 2023.

129. The agreement omitted, among other things, the Second Tranche.

130. These omissions were inconsistent with all prior promises and communications, foreshadowing the events surrounding Plaintiff's termination that were to follow.

131. Over the course of the next few months, Plaintiff requested that Liesenfelt and BEP's human resources amend the letter to include the terms that were agreed to by the parties.

132. Various versions of the agreement were resubmitted by Andrade to Plaintiff for his signature, but none of them reflected the agreement between the parties.

133. However, Liesenfelt repeatedly demanded that Plaintiff sign this backdated agreement.

134. Based on Defendants' unwillingness to document the agreement between the parties, Plaintiff had reason to begin questioning the validity of the statements and misrepresentations that Davie had first made during the January 21, 2021, webinar, as well as in the August 23, 2023 meeting, including but not limited to the value of the CIUs and Davie's/BEP's willingness to ever allow Plaintiff to benefit from them, including the promise made just weeks earlier that he could liquidate 50% of his CIUs upon the next liquidity event.

135. Defendants had exclusive control over the relevant financial and governance documents, and Plaintiff had no independent means of verifying the actual conditions or value of his CIUs, nor the existence or actual status of any liquidity event or outside investment.

136. It was not until after his termination in December 2023 and the subsequent announcement of a $425 million investment in BEP in April 2024 that Plaintiff discovered, or could reasonably have discovered, the full extent of Defendants' fraud and self-dealing.

**PLAINTIFF IS PRETEXTUALLY TERMINATED TO ENRICH DEFENDANTS**

137.    On December 6, 2023, Plaintiff was terminated by Liesenfelt, Tina, and HR executive Sandra Beckett ("Beckett").

138.    Plaintiff was informed that his termination was for "cause."

139.    Defendants revoked all of Plaintiff's CIUs, both vested and unvested.

140.    As of the date of his termination, Plaintiff had vested in 384 of the 400 CIUs from the First Tranche.

141.    The 400 CIUs from the Second Tranche had not yet vested.

142.    The revocation of Plaintiff's CIUs increased the pro rata equity interests of remaining insiders, including Davie, and Tina, who held most of the equity in BEP.

143.    The basis for Plaintiff's termination was fabricated and pretextual.

144.    Plaintiff had no history of misconduct or disciplinary action, and had just received positive performance feedback, and was promoted to President of PA mere months before.

145.    The termination was issued without notice, investigation, or documentation.

146.    Plaintiff was not provided with any written explanation or opportunity to respond to his termination.

147.    Plaintiff requested a review of his termination as "for cause."

148.    According to the Plan terms, any "cause" determination must be made by the Board or a Committee appointed by the Board.

149.    No such review was made, nor was his termination done in accordance with the Plan terms.

## DEFENDANTS' ILLEGAL CONSPIRACY

150.    In or around April 2024, BEP closed a $425,000,000 equity investment from General Atlantic, Blackstone Tactical Opportunities Fund, and Morgan Stanley Tactical Value Fund.

151. In close proximity to this investment, Defendants also terminated other employees who had been granted CIUs, under similar circumstances to Plaintiff, thereby preventing them from receiving the value of their CIUs.

152. Defendants engaged in a pattern of terminating CIU holders as part of a broader scheme to defraud employees, including Plaintiff, by revoking equity compensation, and enriching themselves and other insiders at the expense of those employees.

153. This investment constituted a Liquidity Event under the Plan and would have triggered a substantial equity payout to Plaintiff had he not been terminated.

154. The Defendants received substantial cash distributions in connection with the General Atlantic transaction.

155. Plaintiff's termination enriched Defendants through an increase in their equity ownership and the cash distribution from the liquidity event.

156. Defendants acted in bad faith to enrich themselves by orchestrating Plaintiff's termination, and CIU revocation forfeiture ahead of the investment and liquidity event.

157. Not surprisingly, Defendants concealed the investment prior to Plaintiff's termination.

158. The proximity of the termination to the investment, combined with Davie's financial gain, demonstrates Defendants' intent to defraud Plaintiff.

159. As a result of Defendants' actions and the conspiracy described herein, Plaintiff was fraudulently deprived of his CIUs.

160. On February 28, 2024, Plaintiff submitted a formal legal demand for reinstatement of his CIUs.

161. As of the date of this complaint, no reinstatement or payment has been made.

**NO SAFE HARBOR**

162.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements described in this Complaint. None of the specific statements were identified as forward-looking when made.

163.    Neither Davie's public statements nor private statements to Bradley were accompanied by meaningful cautionary statements regarding Bradley's entitlement to, or the value of, his CIUs.

164.    Further, Davie knew that his statements were false when he made them as described in Paragraphs 65-72 and 95-97 above.

### COUNT I
### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 – First Tranche
*(Against Buyers Edge Platform, LLC and John Davie)*

151.    Plaintiff incorporates and realleges all previous paragraphs as though fully set forth herein.

152.    Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 prohibit fraudulent or deceptive practices in connection with the purchase or sale of securities.

153.    The First Tranche of CIUs constitute "securities" as defined by Section 2(a)(1) of the Securities Act of 1933 and Section 3(a)(10) of the Securities Exchange Act of 1934, as they are investment contracts made in connection with Plaintiff's employment at PA. When granted (and thereafter), they depended primarily on the financial performance of BEP and the managerial efforts of BEP's executives (including Davie) rather than Plaintiff, and they were marketed and offered as equity tied to BEP's growth.

154.    In connection with the offering of the First Tranche, Davie, acting on behalf of BEP, made materially false and misleading statements and omissions.

155.    The misrepresentations made by Davie made on January 21, 2021, were made intentionally or recklessly to induce Plaintiff to accept the securities, continue his employment, and

forgo alternative opportunities. These statements were made via Zoom, email, and in-person meetings.

156. Bradley's acceptance of CIUs via the Carta platform constituted the purchase of a security for value.

157. As a direct and proximate result of Davie, and BEP's misrepresentations and omissions, Plaintiff was induced to accept the CIUs in lieu of other forms of compensation or alternative opportunities, exposing him to significant tax liabilities and ultimately the undisclosed forfeiture of the First Tranche of CIUs.

158. Had Plaintiff been fully informed of the true facts, he would not have accepted the First Tranche of CIUs as compensation or continued his employment with PA on the same terms.

159. Plaintiff's reliance on Davie and BEP's misrepresentations in January of 2021 was entirely reasonable because he was provided no other disclosures and relied on them when made.

160. Davie and BEP made these statements in connection with the offer, purchase, or sale of securities, knowingly and with scienter.

161. The omitted facts and misstatements detailed herein were material to a reasonable investor in deciding whether to accept the CIUs in consideration for his continued employment and forego other opportunities.

162. As a direct and proximate result of Davie and BEP's misrepresentations and omissions, Plaintiff suffered significant economic harm, including but not limited to: (1) the forfeiture of his First Tranche of CIUs; (2) exclusion from participation in the General Atlantic liquidity event; (3) unexpected ordinary income tax liabilities; and (4) the loss of substantial compensation that would have accrued had Defendants disclosed the true terms of the CIUs, and (5) forgoing other valuable employment opportunities.

**COUNT II**
**Control Person Liability – Section 20(a) of the Exchange Act – First Tranche**
*(Against John Davie)*

163. Plaintiff incorporates and realleges all previous paragraphs, as though fully set forth herein.

164. Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78t(a)) imposes joint and several liability on any person who, directly or indirectly, controls a person or entity that has violated any provision of the Exchange Act, unless the controlling person acted in good faith and did not directly or indirectly induce the violation.

165. At all relevant times, Davie was the Chief Executive Officer, majority equity owner, and managing member of BEP.

166. Davie exercised direct and pervasive control over BEP's governance, compensation practices, and securities-related communications, including the Plan, and the offer and administration of CIUs.

167. Davie orchestrated and directed the statements and omissions made during the January 21, 2021 webinar, which form the basis of Count I, including falsely describing the CIUs as equivalent to equity in BEP, materially misstating their tax treatment, valuation, and liquidity potential, and omitting the Plan's forfeiture and discretionary redemption provisions.

168. Davie further controlled the process by which Plaintiff's First Tranche of CIUs was revoked, including the backdating of agreements, refusal to honor Plan commitments, and misclassification of Plaintiff's termination as "for cause" to ensure forfeiture of Plaintiff's vested equity.

169. At all relevant times, Davie had the power to prevent the violations of Section 10(b) and Rule 10b-5 by BEP but failed to do so and instead actively directed and participated in the misconduct.

170. By reason of the foregoing, Davie is liable under Section 20(a) of the Exchange Act as a control person of BEP and is jointly and severally liable for the securities law violations alleged in Count I.

171. As a direct and proximate result of Davie's conduct and his failure to prevent or remedy BEP's fraud, Plaintiff suffered the damages described in Count I, including forfeiture of vested CIUs, lost compensation, unreimbursed tax liabilities, and exclusion from a major liquidity event.

## COUNT III
### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 –Second Tranche
*(Against Buyers Edge Platform, LLC and John Davie)*

172. Plaintiff incorporates and realleges all previous paragraphs as though fully set forth herein.

173. On August 24, 2023, during an in-person meeting with Davie, Liesenfelt, and Tina, Plaintiff was offered the Second Tranche of 400 CIUs as part of his updated compensation package for serving as President of PA.

174. During that meeting, Davie, on behalf of BEP made multiple materially false and misleading statements regarding the Second Tranche.

175. These statements were made with the intent to induce Plaintiff to accept the Second Tranche, to continue his employment, and to forgo other opportunities and leverage, including alternate compensation negotiations.

176. As with the First Tranche, Davie and BEP failed to disclose key facts concerning the Second Tranche and the Plan under which it was issued, including the discretionary valuation, redemption rights, vesting risks, forfeiture provisions, and the governing LLC and Award Agreements.

177. Plaintiff was not provided with these disclosures prior to accepting the Second Tranche via Carta in September 2023. No written explanation of tax liability, redemption limitations, or governance structure was provided at the time of acceptance.

178. Plaintiff's acceptance of the CIUs via the Carta platform constituted the purchase of a security for value.

179. Plaintiff's reliance on Davie and BEP's representations was reasonable given Davie's position as CEO and majority owner of BEP and his control over compensation, and the absence of countervailing disclosures.

180. Davie and BEP's conduct in offering and misrepresenting the Second Tranche was in connection with the offer, purchase, or sale of securities, and was made knowingly or recklessly and with scienter.

181. The misrepresentations and omissions were material to a reasonable person evaluating whether to accept the Second Tranche of CIUs as compensation and continue in his executive role at PA.

182. Had Plaintiff known the true nature of the Second Tranche, he would not have accepted it and would have negotiated alternative compensation or considered other opportunities.

183. As a direct and proximate result of Davie's and BEP's misrepresentations and omissions, Plaintiff suffered significant economic harm, including but not limited to: (1) the forfeiture of his Second Trance of CIUs; (2) exclusion from participation in the General Atlantic liquidity event; and (4) the loss of substantial compensation that would have accrued had Defendants Davie and BEP disclosed the true terms of the CIUs and (5) forgoing other valuable employment opportunities.

## COUNT IV
**Control Person Liability – Section 20(a) of the Exchange Act – Second Tranche**
*(Against John Davie)*

184.    Plaintiff incorporates and realleges all previous paragraphs as though fully set forth herein.

185.    Davie personally participated in the August 24, 2023 in-person meeting where the Second Tranche of CIUs was offered to Plaintiff. During that meeting, Davie made materially false representations about the value, liquidity, and terms of the Second Tranche.

186.    Davie misrepresented, inter alia, that the First Tranche was worth $1,200,000 and the Second Tranche was worth approximately $500,000, that Plaintiff would be permitted to liquidate 50% of his vested CIUs in the near future, and that an imminent institutional investment would substantially increase their value. These representations were knowingly or recklessly false.

187.    Davie further directed the issuance of the Second Tranche through Carta and knowingly withheld material documents governing the CIUs, including the updated Equity Plan, LLC Agreement, and Award Agreement that contradicted his oral representations.

188.    Davie also controlled the internal classification of Plaintiff's separation from PA in a manner that ensured the Second Tranche would be forfeited, including directing a termination "for cause" without factual basis.

189.    Davie exercised actual power and control over the conduct by BEP that constitutes a primary violation of Section 10(b) and Rule 10b-5, as set forth in Count III.

190.    Davie had the ability to prevent misrepresentations, provide accurate disclosures, and refrain from executing the fraud, but instead acted to facilitate, direct, and conceal the misconduct.

191.    Pursuant to Section 20(a) of the Exchange Act, Davie is jointly and severally liable for BEP's violations arising from the fraudulent offer, and sale of the Second Tranche.

192.    As a direct and proximate result of Davie, BEP, and BEPM's misrepresentations and omissions, Plaintiff suffered significant economic harm, including but not limited to: (1) the forfeiture of his Second Trance of CIUs; (2) exclusion from participation in the General Atlantic liquidity event;

25

and (4) the loss of substantial compensation that would have accrued had Davie disclosed the true terms of the CIUs and (5) forgoing other valuable employment opportunities.

### COUNT V
### Breach of Fiduciary Duty Under Illinois Law
*(Against John Davie and Buyers Edge Platform, LLC)*

193.    Plaintiff incorporates and realleges all prior paragraphs as though fully set forth herein.

194.    Under Illinois law, individuals and entities who exercise discretionary authority over the equity rights of another owe fiduciary duties when a relationship of trust and dependence exists.

195.    At all relevant times, Davie served as the Chief Executive Officer, majority equity holder, and managing member of BEP.

196.    In this capacity, Davie exercised comprehensive discretionary authority over Plaintiff's compensation, employment classification, and equity interests.

197.    Davie and BEP owed Plaintiff a fiduciary duty with respect to the truthful administration and communication of the Plan.

198.    BEP through their senior executives and governing documents, created a relationship of dependency and trust with Plaintiff concerning his participation in the Plan and the CIUs awarded thereunder.

199.    Davie and BEP collectively and individually, controlled whether Plaintiff's termination would be deemed "for cause," whether a liquidity event had occurred, whether vested CIUs would be honored, and whether Plaintiff would receive payouts related to the General Atlantic transaction.

200.    By virtue of this control, Davie and BEP occupied a position of trust and confidence with respect to Plaintiff and owed fiduciary duties of loyalty, care, good faith, and fair dealing under Illinois common law.

201.    Davie and BEP breached their fiduciary duties to Plaintiff in the following ways:

a. unilaterally classifying Plaintiff's termination as "for cause" without a factual basis;

b. timing this classification to ensure forfeiture of Plaintiff's vested CIUs immediately prior to the $425 million General Atlantic liquidity event;

c. enriching themselves at Plaintiff's expense via their increased equity in BEP;

d. failing to provide full and accurate disclosure of the material terms governing the CIUs and Plaintiff's equity interest, including discretionary redemption provisions and forfeiture risk; and

e. misrepresenting the valuation, tax treatment, and liquidity prospects of Plaintiff's CIUs.

199. BEP acting through their agents and managers including Davie, knowingly participated in ratifying these breaches, and is liable both directly and vicariously for the wrongful conduct described above.

200. As a direct and proximate result of Davie's and BEP's breaches of fiduciary duty, Plaintiff suffered substantial economic harm, including but not limited to:

a. the loss of his vested CIUs and corresponding payout from the General Atlantic liquidity event;

b. lost earnings and deferred compensation that had been promised and relied upon; and

c. adverse tax consequences, financial instability, and reputational harm resulting from the manner of his separation.

201. Davie's and BEP's conduct was willful, wanton, and undertaken in bad faith for personal and financial gain, entitling Plaintiff to an award of punitive damages under Illinois law.

**COUNT VI**
**Violation of Illinois Securities Law (815 ILCS 5/12(G), (I))**
*(Against John Davie and Buyers Edge Platform, LLC)*

202. Plaintiff incorporates and realleges all prior paragraphs as though fully set forth herein.

203. A person violates the Illinois Securities Law of 1953 if they "obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 815 ILCS 5/12(G).

204. Additionally, it is a violation of the Illinois Securities Law of 1953 "to employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly." 815 ILCS 5/12(I).

205. At all relevant times, BEP was engaged in offering and selling CIUs to Plaintiff, which constitute "securities" within the meaning of 815 ILCS 5/2.1.

206. At all relevant times, Davie was a controlling person of BEP, with authority over the Plan, its administration, and communications with participants, including Plaintiff.

207. Davie and BEP, individually and collectively, offered and sold CIUs to Plaintiff through materially false and misleading statements and omissions during the January 21, 2021 webinar and August 24, 2023 in-person meeting described above.

208. Davie's and BEP's conduct violated 815 ILCS 5/12(G) by engaging in transactions, practices, and courses of business which operated as a fraud or deceit upon Plaintiff in connection with the sale of securities.

209. Davie's and BEP's conduct further violated 815 ILCS 5/12(I) by employing a device, scheme, or artifice to defraud Plaintiff in connection with the sale of securities.

210. As a direct and proximate result of Davie's and BEP's conduct, Plaintiff suffered substantial damages, including but not limited to:

    a. the forfeiture of vested CIUs; and

      b.   the loss of anticipated proceeds from the liquidity event.

## COUNT VII
### Control Person Liability – Illinois Securities Law (815 ILCS 5/13(A))
*(Against John Davie)*

211.    Plaintiff incorporates and realleges all prior paragraphs as though fully set forth herein.

212.    At all relevant times, Davie was the CEO and majority owner of BEP and BEPM, exercising control over its operations, equity compensation practices, and representations concerning the CIUs.

213.    Pursuant to 815 ILCS 5/13(A), any person who directly or indirectly controls a person liable under the Illinois Securities Law is jointly and severally liable to the same extent as that person.

214.    Davie and BEP violated Sections 12(G) and (I) of the Illinois Securities Law by making material misstatements and omissions concerning the value, vesting, risk, and tax treatment of the CIUs.

215.    Davie exercised direct and indirect control over the conduct of BEP, and BEPM relating to the offer and sale of the CIUs and cannot establish that he acted without knowledge or with reasonable care.

## COUNT VIII
### Fraudulent Inducement – Equity Ownership (Illinois Common Law)
*(Against Buyers Edge Platform, LLC and John Davie)*

253.    Plaintiff realleges all prior paragraphs as though fully set forth herein.

254.    Under Illinois common law, a party commits fraudulent inducement when they knowingly make a false representation of material fact, intending to induce the other party to act, and the other party reasonably relies on the false representation to their detriment.

255. During his tenure, Davie, acting individually and as CEO of BEP, made multiple knowing and material misrepresentations to Plaintiff concerning his equity in BEP.

256. Specifically, Davie, acting individually and as CEO of BEP, represented that Plaintiff was to receive equity in BEP as part of his compensation, in addition to the misrepresentations discussed above.

257. At the time these representations were made, Defendants knew them to be false, or made them with reckless disregard for their truth or falsity.

258. These misrepresentations were made with the intent to induce Plaintiff to:

    a. provide services to PA and BEP;

    b. continue working at BEP;

    c. not avail himself of other valuable opportunities and;

    d. forego compensation or other rights.

259. Plaintiff reasonably relied on these representations by:

    a. providing services to PA and BEP;

    b. continue working at BEP;

    c. not availing himself of other valuable opportunities and,

    d. foregoing compensation or other rights.

260. Plaintiff would not have accepted the employment, continued in his role, or agreed to the scope of his responsibilities had he known the equity offer was false, illusory, or subject to revocation at will by BEP and Davie.

261. As a result of Davie and BEP's fraudulent inducement, Plaintiff suffered damages, including but not limited to:

    a. the equity interests in BEP that he was promised;

    b. loss of alternative employment opportunities and career advancement;

c.   lost income, bonuses, and benefits;

d.   harm to his reputation;

e.   attorney's fees and litigation costs.

262.   The conduct alleged herein was willful, malicious, and oppressive, warranting the imposition of punitive damages in addition to compensatory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants Buyers Edge Platform, LLC and John Davie, jointly and severally where applicable, and award the following:

a.   compensatory damages for all damages Plaintiff sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

b.   reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

c.   punitive damages; and

d.   any equitable, injunctive, or other further relief that the Court may deem just and proper.

The Garfinkel Group, LLC
701 N. Milwaukee Avenue
The CIVITAS
Chicago, IL 60642
Haskell Garfinkel (IARDC No. 6274971)
haskell@garfinkelgroup.com
Wayne Garris (IARDC No. 6328048)
wayne@garfinkelgroup.com
(312) 736-7991

Respectfully submitted,

*/s/ Wayne Garris*
One of the Plaintiff's Attorneys