**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL BRADLEY,<br><br>Plaintiff,<br><br>v.<br><br>BUYERS EDGE PLATFORM, LLC and JOHN DAVIE,<br><br>Defendants. | No. 25 CV 13586<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Michael Bradley was the President of Produce Alliance, a company acquired by Buyers Edge Platform. BEP and its CEO, John Davie, gave equity in the company to over 100 employees to retain and motivate them. As BEP neared a $425 million capital infusion that would have allowed Bradley to liquidate his equity at a substantial profit, BEP terminated him for cause. Termination for cause allowed BEP to redeem the equity it granted Bradley at no value—leaving him with nothing. Shortly thereafter, Bradley filed suit in this court alleging multiple violations of state law. I dismissed that case because Bradley failed to establish diversity of citizenship, or any other basis for federal jurisdiction. A year and a half later, Bradley filed this suit, adding federal claims for securities fraud. Defendants now move to dismiss under Federal Rules of Civil Procedure 12(b)(1), (2), and (6). For the reasons discussed below, the motion is granted.

## I. Legal Standards

To survive a motion to dismiss, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). When analyzing the sufficiency of a complaint, I construe it in the light most favorable to the plaintiff, accepting all well-pleaded facts as true and drawing all inferences in his favor. *Atlanta Gas Light Co. v. Navigators Ins. Co.*, 164 F.4th 1038, 1046 (7th Cir. 2026). Legal conclusions, however, are "not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Rule 8(a) "does not demand detailed factual allegations, but it does require more than mere 'labels and conclusions,' or a 'formulaic recitation of the elements of a cause of action.'" *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 494–95 (7th Cir. 2025) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "The complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* at 495 (citing *Iqbal*, 556 U.S. at 678). Put another way, the complaint must "present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

Because Bradley alleges securities fraud, he must also overcome the heightened pleading standards imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act. That means he not only "must state with particularity the circumstances constituting fraud or mistake," but also "must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Fed. R. Civ. P. 9(b); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (quoting 15 U.S.C. § 78u–4(b)(2)(A)); *see also*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (Plaintiffs must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter").

## II. Facts

Michael Bradley worked for Produce Alliance, LLC—first as Chief Operating Officer and then as President—from May 2019 to December 2023. [1] ¶¶ 1, 10, 11.[1] Buyers Edge Platform, LLC is a procurement and technology company that works with the food service industry. [1] ¶ 4. John Davie is the Chief Executive Officer and majority owner of BEP. [1] ¶ 6.

In 2019, a private equity company invested $30,000,000 in BEP. [1] ¶ 13. Subsequently, in early 2020, BEP acquired a minority interest in Produce Alliance. [1] ¶ 14. As part of the acquisition, Produce Alliance's then-CEO George Melshanker told Davie that he was trying to get some form of equity in BEP on behalf of Bradley. [1] ¶¶ 10 & 16. BEP's Board of Managers structured and approved an Equity Appreciation Rights Plan providing such equity to high-performing employees. [1] ¶¶ 17 & 23.

In January 2021, Davie conducted a webinar via Zoom for over 100 BEP and Produce Alliance employees. [1] ¶¶ 22–25. During the webinar, Davie made several statements that Bradley now alleges were materially false. [1] ¶ 26. He told the participants that:

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from the complaint, [1].

- Attracting outside investment was central to increasing the value of BEP. [1] ¶ 27.
- He and his family owned over 80% of BEP. [1] ¶ 28.
- Participants would be receiving equity in BEP to motivate them to "stay with us." [1] ¶ 29.
- Participants would be receiving something that was equivalent to stock in BEP. [1] ¶ 30.
- Anyone on the call was in the program. [1] ¶ 31.
- The program was a way of motivating participants to help grow BEP and, "as the company grows, the value of your ownership in this company is going to grow with it." [1] ¶ 32.
- There was "no doubt that this would become a meaningful part of their compensation." [1] ¶ 33.
- The value of their equity interests "were worth a lot" and would be worth a lot more. [1] ¶ 34.
- The participants "don't ever have to pay for them." [1] ¶ 34.
- "Whatever they ultimately cash in at above this price is going to be capital gains tax, the best tax treatment you can get, 20%." [1] ¶ 36.
- On January 20, 2021, BEP had received an equity investment that now valued their participation at $754 per unit. [1] ¶ 37.

To keep the Plan's terms confidential, Davie told participants to not "go talking about this outside this group." [1] ¶ 35. Davie knew, however, that the interests were to have no immediate value unless multiple conditions were met. [1] ¶ 38. In April 2021, Bradley received an email through Carta, a securities management platform, asking him to confirm acceptance of a grant of 400 Company Incentive Units. [1] ¶ 40. Relying on the statements made during the webinar, Bradley accepted the tranche.

[1] ¶¶ 39–42.[2] At the time, Bradley had not been provided with any information, disclosures, or documents, and had not been afforded an opportunity to ask questions about the Plan's terms. [1] ¶ 43.

Davie and BEP failed to disclose that the Plan was governed by two primary documents: the Equity Appreciation Plan and individual Award Agreements for each participant. [1] ¶ 56. The terms contained in those documents contradicted what Davie had said on the webinar. [1] at 7.[3] The Plan did not confer equity in BEP; it conferred contractual rights—the Company Incentive Units—that mirrored certain restricted LLC interests, and it disclaimed any obligation to treat Company Incentive Unit holders as equity owners. [1] ¶¶ 55, 57. And importantly, vested Company Incentive Units could be redeemed by BEP at no value if the participant was terminated for cause, as determined by the Board in its sole discretion. [1] ¶ 62.

Bradley alleges that Davie knew these terms because he was involved in structuring and approving the Plan and in negotiating the valuation hurdle with a private equity investor. [1] ¶¶ 66, 68. Bradley relied on Davie's statements in accepting the Company Incentive Units and—had he known the true terms—would

[2] Defendants included the Company Incentive Units certificate and Acceptance Agreement as an exhibit with their motion to dismiss. [19-1]. I do not consider that submission, or the terms therein, because the motion to dismiss can be resolved solely by reference to the complaint.

[3] The complaint's paragraph numbering is irregular. Numbers 18–21 and 110–119 are skipped; numbers 53 and 54 are used twice; numbers 151–162 are used once in the statement of facts and again in Count I; numbers 199–201 are used twice; and Count VIII begins at ¶ 253 after Count VII ends at ¶ 215. The skipped numbers do not appear to affect the substance of the complaint. Where a paragraph number is duplicated, the citation is to the page only.

have negotiated for additional cash compensation or considered other employment. [1] ¶¶ 73–77.

In June 2023, Bradley was offered the role of President of Produce Alliance. [1] ¶ 90. On August 24, 2023, he met with John Davie, BEP's president Tina Davie,[4] and Liesenfelt (Bradley's supervisor) to settle his compensation. [1] ¶¶ 88, 92–93. Bradley was told that the first tranche had grown in value to over $1,200,000 and that BEP would transfer a second tranche of an additional 400 Company Incentive Units to him. [1] ¶¶ 94–95. Davie and Liesenfelt said the second tranche being awarded was worth over $500,000. [1] ¶¶ 94–96. Davie also told Bradley that he could liquidate up to 50% of his vested Company Incentive Units after the next investment; Bradley asked to do so, and BEP CFO John Rogers approved the sale. [1] ¶¶ 99–101.

In reliance on these statements and the webinar, Bradley continued his employment and accepted the second tranche through the Carta app in September 2023, again without any disclosures about valuation, redemption, vesting, forfeiture, tax liability, or the governing agreements. [1] ¶¶ 103–04, 176–77. On September 26, 2023, BEP sent Bradley a compensation agreement backdated to August 1, 2023, that omitted the second tranche. [1] ¶¶ 127–29. Over the following months Bradley asked that it be corrected, but none of the resubmitted versions reflected the agreed terms. [1] ¶¶ 131–33. Defendants' continued unwillingness to document the agreement between the parties gave Bradley reason to begin questioning the validity of the

[4] All references to "Davie" are to John Davie unless otherwise specified.

statements that Davie made during the January 2021 webinar and the August 2023 meeting. [1] ¶ 134.

On December 6, 2023, Bradley was terminated for "cause." [1] ¶¶ 137–38. BEP then revoked all his Company Incentive Units. [1] ¶ 139. The termination came without notice, investigation, or written explanation—Bradley had no disciplinary history and had been promoted just months earlier. [1] ¶¶ 144–46. He asked for a review of the "cause" determination, which under the Plan had to be made by the board or its committee, but none was conducted. [1] ¶¶ 147–49.

In April 2024, BEP closed a $425 million equity investment from General Atlantic, Blackstone Tactical Opportunities Fund, and Morgan Stanley Tactical Value Fund. [1] ¶ 150. Bradley alleges that the investment was a liquidity event under the Plan that would have triggered a substantial payout to him; that Davie and other insiders received cash distributions and a larger pro rata equity share as a result of the revocation; that BEP terminated other Company Incentive Unit holders under similar circumstances around the same time; and that the investment was concealed from him before his termination. [1] ¶ 142; [1] at 18–19. Bradley alleges that he did not discover the full extent of the alleged fraud until after his termination and the April 2024 announcement. [1] ¶¶ 134–36.

Bradley filed this suit on November 5, 2025. He brings claims under § 10(b) of the Securities Exchange Act and Rule 10b-5 against BEP and Davie for each tranche (Counts I and III), control-person claims under § 20(a) against Davie (Counts II and IV), a claim for breach of fiduciary duty under Illinois law against both defendants

(Count V), claims under 815 ILCS 5/12(G) and 5/12(I) against both defendants (Count VI) and 815 ILCS 5/13(A) against Davie (Count VII), and a claim for fraudulent inducement under Illinois common law against both defendants (Count VIII). [1] at 20–31.

## III. Analysis

"Section 10(b) of the Securities Exchange Act of 1934 forbids the 'use or employ, in connection with the purchase or sale of any security, of any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Tellabs*, 551 U.S. at 318 (quoting 15 U.S.C. § 78j) (cleaned up). From § 10(b), the Supreme Court has implied a private right of action for purchasers and sellers of securities, as implemented by SEC Rule 10b-5. *Id.*

"[T]here are six 'basic elements' of a Rule 10b-5 claim: (1) 'a material misrepresentation (or omission),' (2) 'scienter,' (3) 'a connection with the purchase or sale of a security,' (4) 'reliance,' (5) 'economic loss,' and (6) 'loss causation.'" *Hunter v. Elanco Animal Health Inc.*, — F.4th —, 2026 WL 2357739, at *6 (7th Cir. Aug. 14, 2026) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)). Defendants argue that Bradley has failed to state a claim because the statements he identified were not materially false and were not made in connection with the purchase or sale of a security.

Assuming that Bradley has adequately pleaded that defendants made a material misrepresentation, with scienter, upon which Bradley relied to his economic detriment—any misrepresentation was not in connection with the purchase or sale of

a security. Furthermore, the face of the complaint establishes that any such claims are barred by the statute of limitations. After dismissing all claims over which I have original jurisdiction, I decline to exercise supplemental jurisdiction over the remaining claims.

### A. Purchase or Sale of a Security

To sue under § 10(b) of the Securities Exchange Act of 1934, a plaintiff must be either a purchaser or a seller of the securities at issue. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–34 (1975); *Anderson v. Aon Corp.*, 614 F.3d 361, 363 (7th Cir. 2010) ("Investors injured by fraud may recover under federal securities law only if the deceit caused them to purchase or sell securities."). Section 10(b) "should be 'construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002). That includes taking "a broad reading of the phrase 'in connection with the purchase or sale of any security.'" *Id.* Still, "the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)." *Id.* at 820. There is no dispute that the Company Incentive Units granted to Bradley were "securities" within the meaning of the Act. The question is whether Bradley's acquisition of the tranches was a purchase or sale of securities.

The statutory definitions describe an exchange. The Securities Act defines "sale" as "every contract of sale or disposition of a security or interest in a security, for value," 15 U.S.C. § 77b(a)(3), and the Supreme Court found a "sale" in a pledge of stock because the pledgee "parted with substantial consideration" to obtain its

interest. *Rubin v. United States*, 449 U.S. 424, 429–30 (1981). The term "purchase" includes "any contract to buy, purchase, or otherwise acquire." 15 U.S.C. § 78c(a)(13).

The Exchange Act's definitions—"any contract to buy, purchase, or otherwise acquire" and "any contract to sell or otherwise dispose of," 15 U.S.C. § 78c(a)(13)–(14)—omit the words "for value," but they require a "contract." "Without signed writings, consideration, and the other legal requirements for enforcement, there is no 'contract'; there is only a promise." *Kagan v. Edison Bros. Stores, Inc.*, 907 F.2d 690, 691 (7th Cir. 1990).

The Supreme Court's decision in *Intl. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v. Daniel*, 439 U.S. 551, 565–69 (1979), is instructive. The plaintiff there was a Chicago truck driver whose union had bargained for a pension plan funded by employer contributions alone—employees paid nothing and had no choice about participating. 439 U.S. at 553–54. An employee argued that he had nonetheless "invested" by accepting and remaining in covered employment—by letting part of his compensation take the form of a deferred pension benefit and giving his labor in return. *Id.* at 559.

The Court rejected that characterization. In every case recognizing a security, "the person found to have been an investor chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security"; in every case "the purchaser gave up some tangible and definable consideration." *Id.* at 559–60. An employee who receives a benefit as an incident of his job does not fit that description. "Only in the most abstract sense may it be said that an employee

'exchanges' some portion of his labor in return for these possible benefits," because "an employee is selling his labor primarily to obtain a livelihood, not making an investment." *Id.* at 560.

The SEC's position on this issue is also helpful. While Bradley is correct that under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 413 (2024), I need not "defer to an agency interpretation of the law simply because a statute is ambiguous," the SEC's expertise may still be persuasive. "[A]lthough an agency's interpretation of a statute 'cannot bind a court,' it may be especially informative 'to the extent it rests on factual premises within [the agency's] expertise.'" *Id.* at 402 (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98, n. 8 (1983)); *see, e.g.*, *Franco v. Chobani, LLC*, 184 F.4th 599, 604 (7th Cir. 2026) (accepting the FDA's reading of its own regulation as persuasive).

In response to *Daniel*, the SEC issued a release setting forth its view on the application of the Securities Act of 1933 to employee benefit plans. *Employee Benefit Plans*, S.E.C. Release No. 6188 (Feb. 1, 1980). The SEC opined that awarding stock at no direct cost to employees does not constitute a sale under the Act. *Id.* The SEC's consideration was thorough, its reasoning coherent, and its position consistent with its earlier pronouncements endorsed by the Court. *See Daniel*, 439 U.S. at 565–69 (observing that "the SEC recognized that noncontributory plans were not covered by the Securities Acts because such plans did not involve a 'sale' within the meaning of the statutes."). All those factors support giving weight to the non-controlling guidance provided by the SEC on this issue. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

Considering the above, I conclude that Bradley's acceptance of the Company Incentive Units did not constitute a "purchase" within the meaning of the Act. Bradley paid nothing for the equity, promised nothing for it, and gave up nothing to get it. [1] ¶¶ 34, 40–44. There was no price and no bargain. That is not a purchase in the ordinary sense of the word, and a gratuitous transfer is not a "contract to ... otherwise acquire" either. The complaint alleges no forgone wages, no transferred assets, and no additional services that needed to be performed for the equity beyond Bradley's preexisting responsibilities—there was no purchase to which fraud could be connected.

Bradley argues that he made deliberate, discretionary decisions to accept the Company Incentive Units and gave valuable consideration for them. [22] at 5. The complaint alleges as much, but only as a conclusion: Bradley "provid[ed] valuable consideration to PA ... in the form of his time, effort, continued employment, and refraining from seeking alternative compensation or employment opportunities." [1] ¶ 39; *see also* [1] ¶ 109. That is the argument *Daniel* rejected—giving labor and staying in covered employment could be called an exchange "[o]nly in the most abstract sense," because "an employee is selling his labor primarily to obtain a livelihood, not making an investment." 439 U.S. at 560.

The facts Bradley pleads fit that description. He was hired in 2019, before the Plan existed. [1] ¶¶ 10, 17. The first tranche arrived by email two years later; he clicked "Accept"; he paid no price. [1] ¶¶ 40–48. The complaint identifies nothing he undertook to get the units—no covenant, no term of service, no task beyond the job

he already held.[5] It alleges that he "forewent other employment and compensation opportunities," [1] ¶ 81(b), but names none, and remaining in covered employment is exactly what *Daniel* held insufficient. That the units were meant to encourage participants to "stay with us," [1] ¶ 29, does not change the analysis. The pension in *Daniel* required twenty years of continuous service, and that was not enough to count as consideration. *Daniel*, 439 U.S. at 555, 560. The allegations in Bradley's complaint are nowhere close to that.

The second tranche is closer to a bargain, because Bradley accepted it as part of his compensation for becoming President of Produce Alliance. [1] ¶¶ 90–94, 173; *see Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555 (2d Cir. 1985) ("an individual who commits [himself] to employment by a corporation in return for stock or the promise of stock" is an investor). But what he gave for it was the same thing—his labor in a new role—and the complaint's own account is that no agreement including the units was ever executed: the compensation letter BEP sent omitted the second tranche, and Bradley refused to sign it. [1] ¶¶ 127–33. A promise of securities that never became an enforceable agreement is not a "contract to … otherwise acquire" them. *Kagan*, 907 F.2d at 691. *But see Yoder*, 751 F.2d at 559 ("a contract for the issuance or transfer of a security may qualify as a sale under the securities laws even if the contract is never fully performed").

[5] The allegation that "Melshanker informed Davie that he was attempting to procure some form of equity in BEP on behalf of" Bradley, [1] ¶ 16, does not support an inference of consideration or that Bradley's CIUs were a unique, separately negotiated benefit. The CIUs were a mass offer of employee benefits, and Melshanker's initial overtures add nothing to the analysis of whether Bradley himself entered into a contract in connection with the purchase or sale of a security.

Nor does the element of choice distinguish *Daniel*. Bradley is right that the plan there was compulsory, 439 U.S. at 553, but the Court's reasoning did not rest on compulsion. It rested on what the employee gave: "in every case the purchaser gave up some tangible and definable consideration." *Id.* at 560. A voluntary decision to accept something free is not a decision to give something up. The tax point fares no better. Whatever exposure Bradley incurred by accepting the units ran to the Treasury, not to BEP, and BEP did not seek it in exchange for the grant. *See* Restatement (Second) of Contracts § 71(2) (Am. L. Inst. 1981) (consideration must be "sought by the promisor in exchange for his promise"). A gift does not become a purchase because the recipient owes tax on it.

The crux of Bradley's complaint is that his former employer withheld compensation which he believes he was owed. That is an employment dispute, and the fact that the compensation happens to be in the form of security instruments does not transform that dispute into one arising under federal securities law. The controversy between the parties is best resolved in the state-court lawsuit Bradley has already filed. *See Bradley v. Produce Alliance, LLC*, 2025LA00000985 (Ill. Cir. Ct. 2025); *see also Gurwara v. LyphoMed, Inc.*, 937 F.2d 380, 381 (7th Cir. 1991) (fraudulent statements made regarding rights to securities plaintiff was promised in connection with his employment were not "in connection with the purchase or sale of a security" despite "seemingly strong case" on state law claims).

### B. Control Person Liability

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under" the Act or its rules "shall also be liable

jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). Liability under § 20(a) is derivative: "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b-5." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). A complaint that fails to state a § 10(b) claim therefore states no control-person claim either. *See id.* at 698 ("[B]ecause the plaintiffs have not adequately alleged the direct liability of any defendant, their § 20(a) claim was also correctly dismissed."). Because there was no purchase or sale of securities, there can be no control person liability against Davie.

**C. Statute of Limitations**

Even if Bradley had adequately alleged all the elements of a claim under § 10(b), dismissal would still be appropriate because he has pled himself out of court. A claim under § 10(b) is subject to the limitations provision that § 804 of the Sarbanes-Oxley Act added to the Judicial Code. *See Foss v. Bear, Stearns & Co.*, 394 F.3d 540, 541–42 (7th Cir. 2005) ("As part of the Sarbanes-Oxley Act, Congress changed the allowable time to the shorter of two years from discovery or five years from the improper transactions.").

The relevant limitations period is two years after the discovery of the facts constituting the violation. 28 U.S.C. § 1658(b). A § 10(b) cause of action accrues "(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010). The "facts constituting the violation" include "the fact of scienter, 'a mental state embracing intent to deceive,

manipulate, or defraud.'" *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)); *see also id.* at 649 ("[F]acts showing scienter are among those that 'constitut[e] the violation.'").

Timeliness under § 1658(b) is an affirmative defense, and it supports dismissal on the pleadings only when the complaint itself establishes it. *Reilly v. Will Cnty. Sheriff's Off.*, 142 F.4th 924, 930 (7th Cir. 2025) ("Plaintiffs are not required to anticipate or refute potential affirmative defenses in the complaint."). "Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations. But dismissal is appropriate when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness." *Cancer Foundation, Inc. v. Cerberus Capital Management, LP*, 559 F.3d 671, 674–75 (7th Cir. 2009); *Logan v. Wilkins*, 644 F.3d 577, 582 (7th Cir. 2011) ("While a statute of limitations defense is not normally part of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), when the allegations of the complaint reveal that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim.").

Bradley filed this action on November 5, 2025, so his claim would be barred if he discovered—or a reasonably diligent plaintiff in his position would have discovered—the facts constituting the violation before November 4, 2023. In responding to defendants' statute of limitations arguments, the final fact constituting the offense Bradley claims to have learned is Davie's scienter. [22] at 11.

All the facts Bradley alleges to support that Davie's statements were made with scienter would have been discovered by a reasonably diligent plaintiff, at the latest, in September 2023. Bradley's complaint alleges that, beginning in September 2023, defendants' unwillingness to document the second tranche he was promised in August 2023 gave him "reason to begin questioning the validity of" Davie's statements. [1] ¶¶ 127–134. If Bradley suspected that Davie's statements were false—including statements obviously within Davie's personal knowledge like whether he actually intended to transfer the equities to Bradley—then Bradley necessarily had reason to suspect that Davie intended to deceive him. *Merck*, 559 U.S. at 650 ("certain statements are such that, to show them false is normally to show scienter as well.") That suspicion would lead a reasonably diligent plaintiff to discover Davie's scienter. Accordingly, Bradley's federal claims are time barred.

Ordinarily, "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend [his] complaint before the entire action is dismissed." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and N.W. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015). But that presumption gives way where amendment would be futile—that is, where "the complaint, as amended, would fail to state a claim upon which relief could be granted." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1085 (7th Cir. 1997) (citation omitted). Because the complaint establishes that Bradley's § 10b claims were untimely, amendment would be futile and the federal claims are dismissed with prejudice.

### D. State-Law Claims

The complaint only gives rise to supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367. The parties are likely not completely diverse, and so there is no basis for original jurisdiction under 28 U.S.C. § 1332(a). *See Bradley v. Produce Alliance, LLC*, 24-cv-02195, [18] (N.D. Ill. Apr. 18, 2024) (dismissing prior case for failure to adequately allege diversity of citizenship). In this circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). I decline to exercise supplemental jurisdiction over the remaining claims.

## IV. Conclusion

Defendants' motion to dismiss, [18], is granted. Counts I, II, III, and IV are dismissed with prejudice. Counts V, VI, VII, and VIII are dismissed without prejudice under 28 U.S.C. § 1367(c)(3). Enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: September 14, 2026